First case this afternoon is People v. Snow. That is case number 4110415. For the appellant, we have Tara Thompson for the appellee, Anastasia Brooks. Are the parties ready to proceed? Counsel, you may proceed. May it please the court, as your honor said, I'm Tara Thompson with the Exoneration Project at the University of Chicago Law School. I would like to Is that the normal time, Mr. Clerk? Five minutes for rebuttal, so you'll have an extra five minutes now for your opening statement. Yes, your honor, thank you. May it please the court, counsel, ladies and gentlemen, as your honors know, I represent Petitioner Jamie Snow, who's here seeking from this court to have you reverse the decision of the lower court, granting the state's motion to dismiss and asking you to remand this case for, in order for Mr. Snow to receive an conviction petition. Obviously, Mr. Snow is not able to be here today, but I know he'd want me to thank you for the opportunity to present his claims to this court. As we're sitting, as we're standing here today, in 2011, almost 2012, it's been a decade since Mr. Snow's trial. And honestly, at the time of this trial, looking at simply the trial record, the evidence that was presented at that time, the state made a compelling case against Mr. Snow. And they made a compelling case against Mr. Snow at the gas station in Bloomington. They had a seemingly neutral eyewitness who testified that he saw Mr. Snow come out of that gas station a few minutes after the gas station attendant seemingly died. They had the responding officer's testimony that seemingly corroborated that eyewitness. They had an eyewitness who was further down the street who also seemingly corroborated the testimony of that eyewitness. And they had a number of people, some of whom were purported close friends of Mr. Snow, who came forward to testify. And at various times in the months and the years since that crime, Mr. Snow had made inculpatory statements about himself and his involvement in that case to the people that he knew. And at the time, it also seemed that Mr. Snow had excellent representation from a well-known and well-respected member of the defense bar in Bloomington. And if you look at the trial record, that's what you see. And Mr. Snow doesn't dispute that. But it's been over a decade since that trial. And since that time, significant new evidence has come forward. And that Mr. Snow, as a pro se litigant and by counsel that has taken up this case, changes the view of this case, changes the look of this case. That was the purpose of Mr. Snow's post-conviction petition, to present this new material relevant evidence that would likely change the result on retrial. Now, as your honors know, the lower court granted the state's motion to dismiss. And in that opinion, which is a four-page opinion, they essentially say that Mr. Snow isn't entitled to relief because the evidence that he presented, the 30-some exhibits and affidavits that the court points out, that those affidavits are just rehashing the trial. In the lower court's view, it doesn't change anything about the case. And this is just an attempt by Mr. Snow to have a relook at the evidence that was presented at trial. But respectfully, your honors, that's not true. This is new evidence. It's evidence that wasn't heard before. And it's evidence that does change the outcome. Well, what is the definition of new to discovered evidence? For purposes of an actual innocence claim, your honor, new evidence is evidence that could not have been discovered previously. And the evidence that is With due diligence, correct? With due diligence, yes, your honor. Counsel, one of the problems I have with your brief is, where do you argue in your brief that the defendant used due diligence in discovering this, these new evidence? How can this court even get to the question until you've shown us that this is newly discovered evidence as defined by case law? I can address that issue, your honor. First of all, many of the affidavits that Mr. Snow presents are affidavits that are recantation evidence. That's essentially what Mr. Pilo's affidavit is. These certain affidavits from some of the, I would call them confession witnesses, that admit that their testimony was false or that they withheld certain evidence about their testimony, that's recantation evidence. And recantation evidence is presumptively new under the law because you can't discover that someone's willing to recant until they actually do so. And so for that evidence, I don't think there's an issue there with respect to those pieces. There is also certain evidence that's discussed in the petition and that Mr. Snow argues is relevant to the issue of actual innocence that may not itself be new. And that's certainly some of the evidence that Mr. Snow has presented. But as we argue in the brief, and as I'm arguing before you here today, when assessing an actual innocence claim, this court is to assess whether taking the matter on retrial, looking at all the evidence together, would that change the results? Looking at the landscape of the cases it's changed. And were this to be retried today, there's other evidence that's come forward that this court should consider as well that collectively would change the result. So I think there's some... Which recantations should we consider to be newly discovered evidence? Because our recantations are not newly discovered evidence. According to case law, do you agree with that? It may depend on the specific factual circumstances. For instance, if someone knows that someone many years before has already said, hey, I lied at trial, I agree that that evidence is considered new at the time that someone first indicates that they lied. But for purposes of the affidavits here and the affidavits that I'm talking about, these are newly discovered recantations. And specifically for one, Jeff Pilo's affidavit is certainly new. With respect to the confession affidavits, Don Roberts' affidavit... Okay, let me stop you there. I don't see what is new in Pilo's affidavit from what he testified to at trial. What is new? I mean, I understand that you said in your brief that he never specifically said that he saw Martinez, I believe, but he never testified at trial that he did see him. So, how is there anything new here to meet the definition? It's a critical distinction, Your Honors, because the question at trial was, did the key eyewitness see Mr. Snow or somebody else come out of that gas station or didn't he? And at trial, the evidence was a little bit unclear with respect to Officer Pilo and what he actually saw. And I think as Mr. Pilo discusses in his affidavit, that was intentional. Because there's some question about how the timeline at trial, there was a question about how the timeline of what Officer Pilo testified in terms of what he was able to see from his vantage point when he arrived at the scene and what he could see of the front of the gas station versus what the major and the specific eyewitness testified about what he could see from the gas station. The question is all about what Officer Pilo's opportunity was to see the person coming out of the gas station that the key eyewitness claimed that he saw. And what Mr. Pilo's testimony does is clarify and make specific... Well, you know, it almost defies logic to me because it seems that you're suggesting that Pilo, that the State would not have asked Pilo if he saw Martinez, if indeed he had seen him. And since he didn't testify that he was seen, is there any reasonable inference of any kind whatsoever that he therefore did not see Martinez that could be drawn? I agree with Your Honor. It's not a question of his testimony changing from I did see Mr. Snow coming out of that gas station to I didn't see Mr. Snow. Because at trial certainly the evidence that was presented suggested that he did not see that person coming out of the gas station. But the question was, did he have an opportunity to see that person? Because the argument from the State at trial was that the reason why he didn't see that person was because his attention was elsewhere. Because at the specific time that the major eyewitness testified to seeing Mr. Snow come out, then-Officer Pilo's attention was diverted elsewhere. The affidavit makes clear that his attention was not diverted elsewhere. It makes absolutely clear that from the time he arrived at the scene, he was viewing the gas station. His attention was directed at that door. His attention was directed at the person at the gas station getting gas, who we now know to be the key eyewitness in this case, the supported eyewitness. And that if somebody came out of that gas station, Officer Pilo definitely would have seen that person. And it is an important distinction because the testimony of that eyewitness is critical to this case and was critical to the question of whether there was evidence that put Mr. Snow at the scene. So that's one particular piece of evidence that's new and that's clearly important to Mr. Snow's claim of actual innocence. There's also the additional evidence that follows from that in terms of other evidence that would discredit the key eyewitness. And as I said, at the time of trial, this eyewitness looks like a neutral person. He looks like a person who has no reason to know Mr. Snow, no reason to identify him for a particular reason. There's no evidence presented that he specifically lied about his basis for understanding or for identifying Mr. Snow. But as the additional information contained in Mr. Snow's petition demonstrates, there's reason to believe that his identification of Mr. Snow is not credible, further reason to believe that. And that's presented from the affidavits from certain of the witnesses whose testimony and whose affidavits appear. And so... Would that be the Hendricks brothers? Yes, Your Honor. I see now you're getting back to one of my problems with whether it's newly discovered evidence. If they knew the defendant from a young age, they were able to testify to that at the time of trial. So I don't see anything newly discovered about that. I agree for those particular pieces. There may potentially be an issue with them being newly discovered. But as I'm arguing, and maybe not doing the best job of, Your Honors, there's a question of what you consider in terms of what drives the actual innocence claim. Meaning, is there some newly discovered evidence to consider? And I argue that there is. The second question is, would that evidence make a difference on retrial? And as I've said, I think you have to consider that in light of everything that you would know, everything that would be presented. Certainly, the Hendricks brothers affidavits are also, I think, in play in Mr. Snow's case with respect to the ineffective assistance of counsel. And this issue was somewhat raised on the post-trial motions and the race judicata issue, which Your Honors may want to discuss as well. But that's still evidence that you consider when determining, you know, would Officer Snow's case make a difference? And that's all the issues that we now know about the eyewitness in this case. There are times in the record where it confuses me, and this is, maybe it's not really all that important, but there was a letter where Atina Hendricks was referred to, I think written by a defendant. There seems to be some confusion that Tina McWhorton was Tina McCombs. I'm wondering, is this Tina? Are there two Tinas? Is Tina Hendricks also Tina McWhorton, also Tina McCombs? Or do you recall? Tina McWhorter and Tina McCombs are the same person, Your Honor. And as to the Tina Hendricks, I confess that I'm not certain specifically which part of the record Your Honor is referring to. I can resolve that issue for Your Honor. There was a letter in the record, and I believe it was written by the defendant, but I'll double check that. And I apologize, Your Honor, I don't have the answer to that question. I'm sorry to interrupt, but keep going. As Your Honor has mentioned, and as we've discussed, there's also these additional affidavits that have to do with the recantations about trial testimony, and about the testimony about the confessions. And as I said, the affidavit from Don Roberts, from Dan Tanaz, and from Ronnie Wright are all new affidavits that are presenting now that their testimony at trial that implicated Mr. Snow in making confessions about this crime were false. And these, again, we argue these specific three affidavits are also new affidavits that go to actual innocence. As do the new affidavits that deal with potential deals that witnesses received in this case. There's a significant amount of new evidence that's presented about the deals that Kevin Shaw received. And there isn't an affidavit from Mr. Shaw recanting his trial testimony, but there's new Mr. Shaw received the deal. There's the affidavit from Ed Palumbo, in which he personally admits that although he didn't, he says he didn't receive a deal, but he says that he testified with the hope that he would receive one, which is different from what he testified to at trial. And there's further evidence, although not as strongly developed in the petition, because it's part of the subject of Mr. Snow's motion for discovery, about deals that other witnesses received, including Bruce Rollins, Jody Winkler, Karen Strong, and Bill Moffitt. And that's also new evidence that goes to Mr. Snow's actual witnesses. And I think this is an important place to point out that part of what the lower court said is that they didn't believe that Mr. Snow deserved a new trial, because in their view, the appropriate standard to consider was whether, and I want to make sure that I get this the result on retrial. And that language is used in some cases, but it's also worded a little differently in other places, which is whether it would likely change the result on retrial. And I think that's an important distinction, because the standard whether it would likely change the result on retrial is something that this court should consider by a preponderance of the evidence. And that's not a high standard. It's not beyond a reasonable doubt, or that given the new evidence of actual innocence, that no reasonable juror could convict Mr. Snow. Well, isn't our standard to review de novo? It is, Your Honor. It's a de novo consideration by this court as to whether this new evidence would likely change the result. So why would it matter whether the trial court used the wrong standard if our review is de novo? I'm simply saying, and I agree, your review is de novo, and that's an important reason why there's not, why this court shouldn't give deference or credibility to the decision below. But I agree, Your Honor's review here is de novo as to the actual innocence issue. And that's another concern I do have with the lower court's decision. And I agree with Your Honor's, you're considering this de novo, but it's also clear from the lower court's opinion that they're applying credibility determination in part. As we pointed out in the brief, there are several places where the court says that it didn't find certain evidence credible, that it didn't believe certain witnesses, that it found some of this unbelievable, and that's all improper at a second stage proceeding. Mr. Snow's petition is essentially an explanation of why there's various pieces of new evidence and why that didn't come out at trial. And one of the main reasons, as we just, as I just discussed with the court, is that some of this evidence was newly discovered. There's also certain evidence that wasn't presented because of ineffective assistance of counsel. And I think this goes to Your Honor's point that there's some evidence in this case that was known before. Perhaps the Hendricks brothers and their impact on the case was somewhat known to counsel. Certain pieces of evidence that wasn't presented because of counsel knew that the Hendricks brothers were relevant witnesses in this case, were people who had something to say. Whether counsel went so far as to actually speak with those witnesses and discover what they might have said, and as to the Hendricks brothers, as to other witnesses, is a question. But those claims do go to ineffective assistance of counsel, not as much to driving an actual innocence. But doesn't that create a res judicata problem for you? There was a fairly extensive hearing at the trial level regarding ineffective assistance of counsel. The trial court made its ruling, it was appealed to this court, and this court issued an order with another fairly extensive analysis regarding ineffective assistance of counsel. This would seem, therefore, to preclude you by res judicata from making the arguments you make in your PC. I want to address that issue, Your Honor, so I'm glad that you raised it. As we've argued in our brief, and as this court knows, res judicata only applies where a litigant has a full and fair opportunity to litigate the issue. And so for ineffective assistance of counsel claims in particular, there's a real question and a real discussion in the case law about whether ineffective assistance of counsel claims belong most appropriately at a post-trial motion examination, or whether they belong more appropriately at a post-conviction litigation. Because certainly there are many issues with respect to ineffective assistance of counsel that fall outside the record. And so there were certain aspects of ineffective assistance that were raised in the post-trial motion, and certain of those that were discussed by this court on direct appeal. There's also issues with respect to ineffective assistance of counsel that are truly new. They're new to, most specifically and most importantly for this case, they're new to Mr. Snow. Because whether post-trial counsel knew about certain issues, or whether Mr. Snow knew about certain issues, to raise them as a post-trial motion is one thing. But there's also issues with respect to the record that Mr. Snow himself only discovered after he took over as kind of pro se counsel for himself on the post-conviction front. And those are claims that he had no opportunity to raise before. And so race judicata doesn't bar those. Specifically, part of that goes specifically to some of the issues that he only learned about from speaking with witnesses. And part of that goes to issues which are more fully explained and more fully discussed by the record. And I do think coloring the entire question of ineffective assistance of counsel here is the new and significant evidence that Mr. Snow developed concerning the potential incapacity that his counsel was laboring under at the time of trial. And I know that simply a lawyer having personal problems at the time of trial does not by itself signal that an ineffective assistance of counsel claim applies. And I recognize that and understand that. Well, that was explored by the trial court, was it not? Well, Mr. Snow did make certain allegations about his counsel's performance in that respect. But what he was able to allege on his own based on his personal observations during trial are very different from the significant new evidence of impairment that was discussed during his counsel's own sentencing. I thought the trial court really got into this issue and got into saying that he'd observed Mr. Pitzel, made comments about how he performed, how he handled cross-examination and the like. And it seems to me that if the trial court got into that much detail, that was reviewed by this court. It's pretty high probable to say that that's not res judicata for purposes of today. If I may finish this question, I know my time is short. Okay. There's a real difference between what counsel is able to do in the courtroom and what they're not doing in the courtroom. And I submit that for a significant murder case, some of the most important work that a counsel is going to do is not in front of the court, not in front of the jury, but it's going to be an investigation and thinking about the case in preparing argument and investigating courses of argument outside of the courtroom. And that's something that the trial court and this court had no opportunity to examine before, had no opportunity to understand what trial counsel was doing when trial counsel was not in the courtroom. This goes to the whole issue of trial strategy because counsel did argue in the post-trial motions that he made certain decisions strategically and that there were certain evidence that he considered but disregarded because he didn't think it was important. And the fact that during the same time period as this trial counsel was, by his own admission at his own sentencing hearing, drinking every day and not working on cases outside of court. And I think that's certainly a fair inference to draw from the record and something that Mr. Snow would explore at an evidentiary hearing. He was not doing work outside of court and that raises a whole question as to what he investigated, what he didn't investigate, and all the other issues that flow from ineffectiveness as a counsel, Your Honor. Since my time is up, I'll let other counsel speak and I'll come back for rebuttal. Thank you, Ms. Thompson, and you will have rebuttal. Thank you. Ms. Brooks. May I please the court and counsel? My name is Anastasia Brooks and I represent the people in this case. I appreciate counsel's candid admission that the way the case had seemed in 2001 was compelling in favor of the state. That shows that this is sort of, there is a long distance that the defendant would have to travel in order to go to make a showing that there would be a likelihood of a different result on retrial if it starts at a compelling case against him. And I do appreciate the sort of like use against the defense here, the remark they made on the reply brief page 7 about nibbling around the edges without doing any real damage and that really sums up not what the defense meant, but what I mean is the entirety of the post-conviction petition and all of its attachments really only nibble around the edges of the state's compelling case and don't really do any real damage against it. So of all the pillars that held up the conviction, not really any of them have been knocked down and very few of them have even been vented. And perhaps their lead issue, this one dealing with Jeff Pelow, the first police officer in the scene, it's not in any way damaging to the prosecution. It was already known that Pelow had not seen anybody coming out of the gas station and this is not a credibility issue and it's something that can be considered because Pelow himself, essentially his position would be that no one left the gas station because he was there, albeit three minutes after the shooting, and he then with a constant eye on the door and going in and clearing the building and noticing there's no one else inside other than the police, then according to his words, it was impossible for the crime to have even occurred because no one left. At least that's of course, if that's really what he's saying, but that's not what he's saying. He's saying from the time he got in position, which is if it was about maybe 14 blocks away according to the police reports and three minutes according to his estimation and there's also tapes that sort of helped establish the timeline. When the silent alarm goes in, it goes to a dispatch, goes to a watch commander and the watch commander then puts out the 1090 and then Pelow drives there, parks in a concealed location behind a building across the south side of the street, gets out, walks around and now he can see. And at that point later on, he is told by Danny Hendricks, somebody had left the gas station and went north and there was apparently a hole in a chain link fence and disappeared behind the building. So it's not a situation where Pelow is in any position to contest what Danny Martinez had seen because Danny Martinez was already there, heard the pops from the gun and was there putting air in his tires. So he had already been on the scene and Jeffrey Pelow was not. And if Jeffrey Pelow hadn't seen anybody leaving the gas station, then necessarily, logically follows, it's not a credibility issue, could not have been there in position to see anybody leave. It's not like he saw somebody else leave or he saw somebody leave and go a different direction than Danny Martinez said. He didn't see anybody. So just by his own account, which hasn't really changed over time, it's not a recantation, but what he says is really irrelevant. And so... Is there a relevance to the fact that he also indicates that the assistant state's attorney suggested to him that she would prefer that he not testify that he did not see anybody leave the crime scene? Well, if I could clarify my earlier remark first, your honor, is his claim about not seeing anyone leave the station is not relevant. What he does say some other things and some things have a conflict to do with what Danny Martinez said like about leaving and coming back or some of the sequence of events. That might be impeaching to Danny Martinez. And then, of course, your question, your honor, gets to implication of what a prosecutor might have told him in preparing him for trial. She doesn't tell him the lie. She just tells him to answer the questions according to him. And, of course, his credibility could be subject to a later hearing if one were ordered. But in just even accepting as true for the purposes of this motion, as all these allegations have to be accepted as true just for these purposes, it does not show that Jamie Stowe is actually innocent. It just shows that a diligent prosecutor was trying to control a witness to say, just answer the questions I ask. And that's not. So the answer to my question is that for purposes of this hearing, even if it was suggested that he should not testify, not seen by leave, it wouldn't make any difference. It would not make any difference for the issue of if that had been known, like, for example, the Brady analysis would not be material for Brady purposes and would not create, it would not be conclusive evidence of actual innocence that would create the likelihood of a different result on retrial. Those are the tests that the defendant would have to meet. And also would not, the other tests the defendant has to meet is like prejudice and deficient performance with the Strickland standard. Other things the defendant has to meet is the likelihoods of misidentification for purposes of suppressing ID. He has to show bias in order to get a new judge on remand that he requests. And also you have to show any abuse of discretion in the denial of request for discovery. You have to show that his request for IBIS ballistics testing would significantly advance his claims of actual innocence. And the defendant feels short on all these. What is their burden to try to show all these elements in order to get any relief on any of these grounds? With respect to Luna, there's not really anything different in the affidavit. At trial, Luna says the defendant fit the picture in his mind when he saw the lineup. He thought the defendant was the person. He was asked to be sure. He never said yes. He just said he thought that that was the person. In post-conviction affidavit, Luna now says the defendant best fit, but Luna could not say he was sure. So essentially we have the exact same thing. Luna was not a perfect eyewitness. This was not, according to the prosecution, an eyewitness case. Luna provided some corroboration. According to the police report, the defendant looked like the offender based on, James Snow looked like the offender according to his face, shape, and hair. So this is just important corroboration along with some of the other things. The non-admission testimony, a not directly confession testimony, but things like when the defendant refused persistently to stand in the lineup, was even told he would be chained to the bars or held up in force by other officers, and only after somebody said, okay, officers, go help him into the place in the lineup, then he finally relents. That's highly incriminating. It shows consciousness of guilt, like him hiding out in the attic in Missouri or giving false names and providing somebody's stolen birth certificate, and then running away when they wanted to check his tattoos in Ohio. Again, consciousness of guilt. And the other things are when he was arrested for an unrelated robbery, Officers Thomas and Bernard Guiney, this is weeks after the shooting, he kept asking them and getting agitated. He wants to know about why they're looking at him for the Clark shooting. He wants to know what would happen to him if he knew something about the murder. He even said he wouldn't have to incriminate himself if he told the truth about his involvement. And of course, the defendant denies this, and the only thing that's new in the post-conviction petition is a reference to some grand jury testimony where one of these two officers was asked, specifically about the Freedom Oil robbery, and about the defendant seeking assurances before discussing his involvement in that robbery. Well, of course, that's something totally different. It does not show that they were lying. And so there's really nothing new. And those are important things that none of which were contested in the petition. Tim Powell, he saw a defendant going to the Clark Station, which of course the defendant adamantly denied ever being in that particular Clark Station. The Minister Bill Gattis, he saw these people together, heads down. Somebody said the defendant shot a boy at a gas station, then the defendant didn't deny it. And we don't have anything new to challenge that. Defendant's best friend, Randy Howard, a couple days later, the defendant confesses and even acknowledges the composite drawing looks just like him. Post-conviction affidavit. Howard says he told the police the truth. And of course, he only said that police visited him every week and asked him many questions. We don't have any officer's guilt and we don't have any threats. Ed Colombo doesn't really say anything different at trial, unlike the defendant's claim here. At trial, he admitted that he had hopes of leniency when he informed on the defendant to the police. And the post-conviction petition, the affidavit says that he, when he went to the police to inform, he was trying to get a deal. Again, the exact same thing that he already testified to at trial. And then Ed had... Well, didn't he also say in the PC affidavit that he thought Jamie was BSing? And... Well... He didn't necessarily say that Jamie didn't say it, but he did say he didn't believe him. Right. And like what Randy Howard said at trial is that he said later, like, that he was kidding, but he had... So there was a reference to the fact that maybe that his statement was made. That's not challenged. The question is maybe what he meant when he said that he was guilty of this horrible crime. It's still, the admission itself stands. Substantially stands, at least according to Ed Colombo. And Ed Hammond, this is a confession in prison that was corroborated on details such as a .22 caliber being used, something knocked over in the robbery, and the defendant encountering somebody in the parking lot. Again, there's nothing new to try to take out Ed Hammond's testimony. Kevin Schall, it's termed a deal, but at trial Kevin Schall admitted that an ATF agent, that's a federal agent, had offered to help him if he cooperated. Now we're not talking about cooperating in this case. Kevin Schall had plenty of trouble on his own. And the prosecution also made him no promises. And again, that's true. The records now show that nothing really new here, that Schall cooperated in many cases, not just providing prosecutors information in this case. And the later defense, in their discretion, asked the federal court for a downward departure under sentencing guidelines, which he got. Again, it's not a deal, he's not promised anything. The fact that eventually... Well, he actually was sentenced prior to the trial anyway, wasn't he? I believe it was... I don't know exactly the date of the sentencing. I think it was in July of 2000. So that would have been available to the defendant to use if he thought that he had received some kind of benefit for his testimony. If it were the case, then yes, it would have been available. But it's also publicly known. They knew that Kevin Schall was facing federal sentencing, and they simply could have looked it up in the public record or asked him about it. So there was no Brady violation because of that. Going on here, Jody Winkler, they called it a deal, but there's no connection that's been currently made between the January 2000 plea agreement for four years in prison on a forgery charge. So there's no essentially a deal there for Jody Winkler. And as to Danny Martinez, I'm now getting to the type of witnesses the defendant now is putting dents in those pillars. The first set I just went through compelling in themselves and not really affected by this post-conviction petition. Now, these are the ones that if alleged new facts are believed, still only puts minor dents in the prosecution's case. Danny Martinez, I think the defense kind of overstates his importance. The defense counsels at the this is a very detailed Crankle hearing. They said they thought that Danny Martinez was kind of severely damaged by the time they got done cross-examining him. So trying to bring in the Hendrixes, which would have been friends of the defendants, and bringing up all their history and problems would have actually complicated the defense. So they had a valid trial strategy for not going down that road. But even then, what we have is a situation like under the Collier case where they talk about evidence that merely impeaches is not such of a conclusive character. Now, they criticize the trial court for making credibility determinations, but there's a difference between saying that even if an alleged fact were believed, even if it were deemed credible, it would still not be good enough to make that required showing, a very hard showing to make, that the new evidence is of such conclusive character that a new trial would probably change the result. So, again, the same thing as Karen Strong, the only new thing is identified as possible impeachment material. It's not even very good impeachment material. It's just the idea that somebody heard a rumor that maybe she had been working off an arrest. Also, there is some prior inconsistent statement she might have made disclaiming knowledge about the offense. But she was a somewhat important  crime. The defendant tried to stay in her place, and Mark McCowan, who could have been one of the co-defendants, said that Jamie Snow had committed these crimes and that's why he needed a place to stay. Dawn Roberts is kind of overstated. She's not nearly as important as Karen Strong. There was a toast. I think in trial she said it was given to Billy Little, but this toast importance of this toasting incident is kind of way overblown. But even in the post-conviction, she still admits to taking down composite drawings that were placed all around town in order to help her friend, defendant. Now, why would she be trying to help the defendant by taking down composite drawings of a robber, who, of course, these composite looked like the defendant. So, but that's what she said, and that still stood in her post-conviction. Bruce Rowland, again, there's no deal. And when the defense makes a grand claim that the police had a modus operandi, visiting witnesses and offering deals, well, they can't even cite one. And when you get to Bruce Rowland, you see that he was the one who was approaching police saying, well, he just got arrested for DUI. And he says he has some information. He wants to know what he can get for it. So, a reply comes back from the state's attorney's office to the police officer that the office of the state's attorney has a history of taking such cooperation in account of sentencing. Again, it's not a deal. And Bruce Rowland actually goes to prison for five years in consecutive sentences for traffic offenses. So, he hardly got much of a deal, even if it were one, but it's not. Dan Tannis is one of these Florida witnesses. He did partially recant, but he still never recanted the part where the defendant said they shot somebody, which is still an important admission. Mary Burns is now a new witness. Darren Smart, another inmate, that apparently would have been a witness to this conversation. And the defendant, though, testified that Burns had misunderstood what he said. And this is, of course, the defendant telling this correctional officer that he had been in the alley behind the Clark station during the commission of the crime, trying to blame it on some unidentified male or female who was also in the car. So, again, an important admission, placing him there at the scene of the crime, which disputes the alibi where he said he was with his wife all day. The other claims that these actual recantations are either insufficiently supported, such as the hearsay affidavits provided by an investigator with the Steve Shield one, as well as Bill Moffitt, one of the Hendrix said that he got a claim that he got a time cut. Rodney Wright is a full recantation, but again, it's interesting in the sense that there's no threats or deals that are alleged that were made by the prosecutors or the police. And also his recantation is based on a claim that he was able to say all this because he had read all of the defendant's discovery, which of course is the fact that at trial the defendant had absolutely and categorically denied. So it then gets into a situation where even if Rodney Wright's recantation were to be believed, then that would make the defendant a bald-faced liar, which would, it's not something that's going to impact the credibility of his other denials of confessing and committing the crimes and having an alibi. So with respect to ineffective assistance, there's no relevant precedent cited in their case in their brief for presuming prejudice. What do we do about, I mean, this is a case with 56 witnesses, no forensic evidence, we know something post-trial about defense counsel's difficulties. We know more now. So the defendant was represented by someone who generally is viewed as capable, but had suffered a stroke, so that limited his ability to communicate. And the other individual we now know, even though we knew then that there may have been some issue, we know that he was an almost adult-life alcoholic with a deteriorating personal situation, daily drinking bouts, inattention to cases. And while he said, well, all I have to do in the courtroom is react, trying a case as a judge with 56 witnesses would be extremely difficult, being the attorney who has to pay attention to how they are examined and cross-examined would be an extraordinarily arduous task. Why isn't that coupled with some of the things that the defense is able to point to? Why doesn't that make us think there was ineffective representation, or at least we ought to go further with that? Well, their major claim is that the defense was unprepared, which is something that was totally rejected by the trial court who looked through the billing statements when they submitted to be paid. And the fact that Riley might have had it possible, I'm not sure what his impediments were in terms of speech, but he was still responsible for preparing and he had hired investigators and that Pickle was the important attack dog and he was in court, he was able to do what was an excellent job according to the trial court, according to the trial court's view of the performance, was excellent. And there was no showing of impairment during trial. And the affidavits talk about how pre-trial, this is not during trial, two to three alcoholic drinks during lunches. After the case already went to the jury, then he also had like a couple of drinks, I think, maybe, and then their question came back from the jury. So it's not like a situation where there was massive amounts of alcohol consumed during the trial or before the trial or anything. Well, except now there's substantial reason to believe that's probably not true. Well, that was all that and there was no indication. Well, that's what I mean. We know from, I mean, defense counsel, when he is talking to the court in relation to his own sentencing and disbarment and the people that examined him, they're not trying to do anything to help with a claim of ineffective assistance of counsel in an old murder case. They're being, attempting to be objective regarding the fact that this guy is a alcoholic who has basically lost his life, lost his practice, and was mentally impaired. Not only is he an alcoholic, he has mental illness issues and that these go back to dates preceding the trial. May I please respond to that, Your Honor? Yes, please. Well, essentially, he did have problems with alcohol during the general timeframe, but unless there's a point to definite showings of trial or preparation that affected the actual representation, and they just haven't made that claim, especially when the trial court's already resolved this issue adversely to him. So essentially, that's my response to your question. Does the panel have any other questions? Seeing none, thank you. I'd like to thank you, Your Honors, and request this court to affirm. Thank you. Rebuttal, please. I want to address this court's questions, if they have any. I have one key point I want to make, which is that in the lower court, Mr. Snow's request for ballistic testing largely went by the wayside. There's no ruling from the court, there's no explanation from the court as to its denial of that motion. It's simply denied. And I don't want that to fall by the wayside before this court, too. That is an important part of what Mr. Snow is seeking. And again, I didn't hear anything from the state, much as there wasn't really anything in their briefs explaining why Mr. Snow was not entitled to that testing. His case is a classic example of a case where ballistics testing on the bullets found at the scene have the potential to produce material evidence that would point to other suspects, or point to the person that actually did this. And so that's an important part of what we're requesting today. Would it be the idea that if the gun was used at a time that it wasn't accessible to Mr. Snow, for whatever reason, that that shows maybe somebody else was floating around committing robberies or using it, and it was also the same person? That's one possibility. And it's also possible that an IBIS search could come back to a crime that we know someone else committed. So not even a question of crimes that Mr. Snow wasn't around to commit, but crimes we know somebody else did. But how would that show that Mr. Snow didn't commit this crime? It doesn't have to... For under the statute, the ballistics testing statute, it doesn't have to conclusively show that he didn't commit this crime. It simply has to be material and relevant evidence. And the way that DNA testing usually goes, and the way that ballistics testing usually goes, is it gives you a place to start to develop a claim. And so if this, if evidence from the ballistics testing points to someone else, that will give counsel room to argue that that's a crime that that person committed without Mr. Snow's involvement. But clearly without knowing what that exactly shows, we can't make that argument yet, but we will be able to depending on the outcome of the testing. And that's all that the statute requires. What would be your best case supporting graining this motion? In terms of precedent, Your Honor? Yes. I believe this case is squarely on point with Pursley, which is a recent Supreme Court case that we do cite in our briefs. This is exactly the same situation, and it supports graining it here. The other larger point I want to make to this Court is that to point out again the procedural posture in this case. Mr. Snow was not here before this panel asking for a new trial today. He's simply asking, as Your Honor pointed out in talking about the ineffective assistance of counsel claims, that he be allowed the opportunity to be heard on these issues. And he was not allowed the opportunity to be heard below. He's presented substantial evidence that supports each of the constitutional claims that he's raised, and some of these claims he hasn't been able to completely perfect because he needs discovery to complete them. The rules recognize that there are going to be situations where that's true, and it's certainly true with his Brady claims and some of the evidence of deals that he discusses. He's presented the evidence that he does have those existed, but he does need discovery to complete those. And that's all he's asking for is an opportunity to be able to further prove these claims and to be heard below. And that's why, Your Honors, we're asking that you reverse the lower court's dismissal and remand this back for an evidentiary hearing, for the discovery that Mr. Snow seeks. If Your Honors have no more questions, I'm finished. Seeing none, thanks to both of you, the case is submitted. The court stands in recess.